**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**MIGUEL ROMERO,**

                               **Plaintiff,**

                 v.                                        **1:19-CV-1477**
                                                                   (FJS/CFH)

**IRVING CONSUMER PRODUCTS, INC.;**
**and DISTRIBUTION UNLIMITED, INC.,**

                               **Defendants.**

_____

**APPEARANCES**                                  **OF COUNSEL**

**HOFFMAN & SCHWEITZER**         **DARIO A. CHINIGO, ESQ.**
212 West 35th Street
12th Floor
New York, New York 10001
Attorneys for Plaintiff

**SMITH, SOVIK, KENDRICK**        **KAREN G. FELTER, ESQ.**
**& SUGNET, P.C.**                         **MARLA E. RAUS, ESQ.**
250 South Clinton Street             **VICTOR L. PRIAL, ESQ.**
Suite 600
Syracuse, New York 13202-1252
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. BACKGROUND

Defendant Irving Consumer Products, Inc. ("Defendant Irving") manufactures tissue

products, including diapers and training pants, for North American retailers. *See* Dkt. No. 74-

21, Def's Stmt. of Material Facts, at ¶ 1.[1] Plaintiff is a self-employed tractor trailer driver who suffered severe injuries when Defendant Irving's product allegedly collapsed on him when he opened the doors to his trailer and the product fell out of the truck. *See* Dkt. No. 78-1, Pl's Counter-Stmt. of Material Facts, at ¶¶ 1-3, 28.

Defendant Irving's diapers and training pants are manufactured and packed in Moncton, New Brunswick, Canada, and then sent to a warehouse where the cases of product are manually palletized on uniform pallets. *See* Dkt. No. 74-21 at ¶¶ 3-4. Defendant Irving uses pallet layout software, called the TOPS program, to specify the number of cases per pallet and number of cases per layer to create pallet pattern layouts to fit the product on a standard size tractor trailer for transport. *See id.* at ¶¶ 6-8. After the cases are palletized per the TOPS specifications, either one or two bands of safety wrap is applied to the "cube" of product for stabilization. *See id.* at ¶ 10. The pallet is then moved by forklift to a wrapping area where a "hood wrap" is applied like a hood over the entire cube. *See id.* After manufacturing, packing, palletizing, and wrapping the product, Defendant Irving transports its merchandise to warehouse facilities all over North America, where it is stored until it is time to ship the product to its customers. *See id.* at ¶ 16. In this case, Defendant Irving transported the product by truck to a warehouse operated by Defendant Distribution Unlimited, Inc. ("Defendant Distribution"), where the pallets were unloaded and stored. *See id.* at ¶¶ 18, 20.

Plaintiff alleges that, in May 2018, he was retained to pick up a load from Defendant Distribution's Rotterdam, New York facility and drive it cross-country to two destinations on the West Coast, the first in Washington and the second in Oregon. *See* Dkt. No. 78-1 at ¶¶ 10-

---

[1] The facts in this section are taken from both Defendants' Statement of Material Facts and Plaintiff's Counter-Statement of Material Facts, and they are undisputed unless otherwise noted. *See* Dkt. Nos. 74-21, 78-1.

- 2 -

11. Defendant Distribution used "live-load" shipping, in which a driver backs up his tractor trailer to a dock, opens the doors of his trailer, and the trailer is loaded. *See* Dkt. No. 74-21 at ¶¶ 28, 32. This is in contrast to "drop and hook" trucking where a driver picks up an already loaded and sealed trailer. *See id.* at ¶ 30. As part of its live-load shipping, Defendant Distribution's employees did not open or close the doors of the trailer or place the seal, but they loaded the trailer with the pallets of wrapped cargo using forklifts. *See id.* at ¶¶ 30, 33. Per Defendant Irving's instructions, when Defendant Distribution's employees loaded the diaper pallets onto the trailer, they were instructed to place an air bag between the last two pallets at the "tail" of the load; and, if there was a multi-stop load, Defendant Distribution's employees would place an additional air bag in the middle of the trailer. *See id.* at ¶ 35.

On May 14, 2018, Plaintiff picked up the load from Defendant Distribution's facility. *See* Dkt. No. 78-1 at ¶ 13. Plaintiff alleges that Defendant Distribution's employees directed him to sit in the cab of his truck and not to leave the truck while they loaded its trailer.[2] *See id.* at ¶ 15. The total shipment on the trailer contained 30 pallets, weighing 12,629.8 pounds, which was substantially below the trailer's 70,000-pound net weight capability. *See* Dkt. No. 74-21 at ¶ 56. After closing the doors of the trailer, Plaintiff checked out, received the required paperwork and a seal for the trailer, placed the seal on the doors of the trailer, and then left Defendant Distribution's facility. *See id.* at ¶¶ 84-86. Plaintiff alleges that, at no time during the cross-country trip, did he feel anything in his trailer shifting, he did not hit his brakes hard, had no accidents along the way, did not hit any curbs, and had no problems getting to the first delivery destination in terms of direction. *See* Dkt. No. 78-1 at ¶¶ 25-26.

---

[2] As will be discussed with respect to Defendant Distribution's summary judgment motion, there is some dispute as to whether Defendant Distribution's employees ordered Plaintiff to stay in the cab of his truck or if he was able to observe the loading process from somewhere else.

Upon his arrival at the first delivery destination in Pullyap, Washington, on May 19, 2018, a gate keeper directed Plaintiff to open his trailer doors and back the trailer to the delivery gate and platform. *See id.* at ¶ 27. Plaintiff alleges that, when he opened the rear trailer doors, the stacked box of diapers nearest the right rear (tail) door fell out of the truck, onto Plaintiff, crushing and severely injuring him. *See id.* at ¶ 28. Plaintiff further alleges that there were no air bags anywhere in the rear of his trailer, nor were there any securement devices applied to the load in the rear of the trailer.[3] *See id.* at ¶¶ 29-30. Plaintiff alleges that, after he was able to pull himself free from the boxes that fell on him, he watched others unload the truck and saw that there were no air bags whatsoever in the rear of the truck. *See id.* at ¶¶ 39-40. Plaintiff claims that this violates Defendant Irving's own rules and regulations, and Defendant Distribution's loaders' failure to follow those rules caused Plaintiff's load to shift as he drove cross-country. *See id.* at ¶¶ 41-43.

Plaintiff therefore commenced this action in November 2019 against Defendant Distribution and "Irving Tissue Company Limited," alleging one cause of action of negligence.[4] *See generally* Dkt. No. 1. Plaintiff filed an Amended Complaint in March 2020, adding Defendant Irving and "J.D. Irving Limited" as Defendants. *See generally* Dkt. No. 17. The parties later stipulated to permit Plaintiff to file a Second Amended Complaint ("SAC") naming the proper entities in this action, Defendants Irving and Distribution (hereinafter collectively referred to as "Defendants") and dismissing its actions against J.D. Irving Limited and "Irving

---

[3] As is discussed below with respect to Defendant Distribution's motion for summary judgment, all facts regarding the placement or lack of securement devices, including air bags, are in dispute.

[4] Plaintiff commenced this action relying on diversity subject matter jurisdiction as he is a resident of Texas, Defendants are New York corporations, and Plaintiff alleges damages exceeding $75,000.

- 4 -

Tissue Company Limited." *See* Dkt. Nos. 23, 24, 25, 26, 27. Magistrate Judge Hummel later denied Plaintiff's motion for leave to file a Third Amended Complaint, *see* Dkt. No. 64, thus making Plaintiff's SAC the operative pleading in this action, *see* Dkt. No. 27. Pending before the Court is Defendants' motion for summary judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking to dismiss Plaintiff's SAC in its entirety. *See* Dkt. No. 74. Plaintiff opposes that motion, and, additionally, filed the pending cross-motion, brought pursuant to Rule 702 of the Federal Rules of Evidence, to preclude the declaration, report, and testimony of Defendants' expert, Richard Carr, Ph.D. *See* Dkt. No. 78. Defendants oppose Plaintiff's cross-motion. *See* Dkt. No. 81. The Court addresses each motion in turn.

## II. DISCUSSION

### A. Summary judgment standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The movant may satisfy this burden "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)).

Once the movant meets this initial burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing

*Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)). Specifically, the moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the non-movant] do not establish the absence or presence of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1)(A)-(B). The party opposing a motion for summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico*, 132 F.3d at 149) (other citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (citations omitted). "Rather, the nonmoving party must present 'significant probative evidence tending to support the complaint.'" *Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 U.S. Dist. LEXIS 4943, *9 (S.D.N.Y. Mar. 26, 2002) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).

### B. Whether Defendant Irving is entitled to summary judgment

Defendants argue that it is unclear what claims, if any, Plaintiff factually pled against Defendant Irving. *See* Dkt. No. 74-22 at 12. In Plaintiff's SAC, he alleges one cause of action for negligence generally against both Defendants. *See generally* Dkt. No. 27. "Under New York law, '[i]n order to set forth a prima facie case of negligence, the plaintiff's evidence must establish (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) that such breach was a substantial cause of the resulting injury.'" *Birch v. White Way Laundry, Inc.*, No. 1:19-cv-1560 (GLS/DJS), 2021 U.S. Dist. LEXIS 179432, *6 (N.D.N.Y. Sept. 21, 2021) (Sharpe, S.J.) (quoting *In re Lake George Tort Claims*, 461 F. App'x 39, 40 (2d

Cir. 2012) [(summary order)] (quoting *Merino v. N.Y.C. Transit Auth.*, 218 A.D.2d 451, 457, 639 N.Y.S.2d 784 (3d Dep't 1996))).

In his SAC, Plaintiff alleges that, on May 14, 2018, he picked up a load of chattel at Defendant Distribution's facility, and Defendant Distribution's employees loaded the pallets of chattel into his trailer without his assistance. *See* Dkt. No. 27 at ¶¶ 13-20. Plaintiff generally alleges that Defendants had a duty to "safely, properly and adequately load and secure the goods onto the truck, to warn the plaintiff of any problems or issues relating to the loading of the truck, and to inspect the truck to ensure the proper loading of the goods/chattel onto the truck, before turning the truck back over" to him. *See id.* at ¶ 21. After suffering an injury on May 19, 2018, when he opened the rear door of his trailer and the pallets of chattel fell out of the truck and crushed him, Plaintiff alleges that the pallets of chattel "were loaded onto the back of [his] tractor-trailer by the [D]efendants," and their employees were negligent, careless, and reckless in improperly loading the truck. *See id.* at ¶¶ 23-25. Plaintiff alleges that Defendants failed to confer with him regarding loading the truck, failed to properly tie down the load vertically, failed to apply chain lashings or webbing, and failed to "unitize the loads or in negligently, carelessly and recklessly unitizing the load that was loaded upon the tractor trailer truck operated by the plaintiff[.]" *See id.* at ¶ 29.

In a decision denying Plaintiff's motion to compel discovery from Defendant Irving with respect to the packaging and wrapping of the pallets, Magistrate Judge Hummel found that the language in Plaintiff's complaint about "unitizing" the load "related solely to the loading of the pallets on [P]laintiff's trailer on May 14, 2018." *See* Dkt. No. 64 at 12. When looking at each of the preceding paragraphs in Plaintiff's SAC, and the context of the complaint as a whole, Magistrate Judge Hummel concluded that "unitization" could not have meant wrapping or

packaging the pallets prior to May 14, 2018. *See id.* at 12-13. Magistrate Judge Hummel also pointed to Plaintiff's own deposition testimony to support this conclusion, in which Plaintiff made it clear that his allegations against Defendants in this matter stemmed wholly from the allegedly improper loading and securing of the load in his trailer before his cross-country drive. *See id.* at 13-14. For these reasons, Magistrate Judge Hummel denied Plaintiff's motion to compel deposition testimony and other discovery relating to Defendant Irving's packaging and wrapping the pallets before May 14, 2018 as "not relevant." *See id.* at 14.

After reviewing Plaintiff's SAC, the Court agrees with Magistrate Judge Hummel's findings and concludes for the same reasons that Plaintiff's claim pertains to the loading and securing of the pallets onto his trailer on May 14, 2018, not to how Defendant Irving packaged or wrapped those pallets at some earlier time. The only allegations in the SAC truly pertaining to Defendant Irving relate to the fact that it was "a tissue products producing company" that owned or operated the Rotterdam facility, and its employees loaded the chattel into Plaintiff's truck. *See* Dkt. No. 27 at ¶¶ 9, 13, 15, 19. In response to Defendants' statement of material facts in support of their motion for summary judgment, however, Plaintiff did not dispute that, after manufacturing, packing, palletizing, and wrapping its goods, Defendant Irving transports its merchandise to Defendant Distribution's warehouse facilities, where the goods are stored until time to ship to its customers. *See* Dkt. No. 78-2 at ¶ 16. Plaintiff further admitted that he arrived at Defendant Distribution's facility to pick up the load and that Defendant Distribution's employees used forklifts to load the cargo onto the trailer. *See id.* at ¶¶ 31, 33. Plaintiff conceded that, once Defendant Distribution's employees loaded the trailer, he would pull away from the dock and close the trailer doors and seal the trailer himself. *See id.* at ¶ 47. Additionally, Plaintiff admitted that Defendant Distribution "inspects all products delivered by

[Defendant] Irving and would rectify any issues with the pallets," such as "re-wrapping if there were tears in the plastic, shifting of the packages, or damage to the pallets." *See id.* at ¶ 49.

Based on these undisputed facts, and Magistrate Judge Hummel's conclusion that evidence of Defendant Irving's wrapping and packaging the pallets before May 14, 2018, was irrelevant to Plaintiff's claims, the Court finds that Plaintiff's negligence claim truly rests against Defendant Distribution, not against Defendant Irving, who had no interaction with the cargo after wrapping it and transporting it to Defendant Distribution's facility.  The Court concludes that Plaintiff simply has not raised any allegations showing that Defendant Irving owed him a duty, breached that duty, or otherwise caused his injuries.  Accordingly, the Court grants Defendants' motion for summary judgment to the extent that it relates to any claim Plaintiff may have alleged against Defendant Irving in his SAC.

### C. Whether Defendant Distribution is entitled to summary judgment

As stated above, to set forth a cause of action for negligence under New York law, the plaintiff must establish that the defendant owed the plaintiff a duty, the defendant breached that duty, and the breach was a substantial cause of the plaintiff's resulting injury. *See Birch*, 2011 U.S. Dist. LEXIS 179432, at *6.  "The question of the existence and scope of an alleged tortfeasor's duty 'is, in the first instance, a legal issue for the court to resolve.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Waters v. New York City Hous. Auth.*, 69 N.Y.2d 225, 229, 513 N.Y.S.2d 356, 505 N.E.2d 922 (1987); *accord Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585, 611 N.Y.S.2d 817, 634 N.E.2d 189 (1994)).

Regarding the "duty" element, Defendants point to the Federal Motor Carrier Safety Administration's regulations ("FMCSR"), which maintain that drivers may not operate a commercial motor vehicle unless its cargo is "properly distributed and adequately secured[.]" 49 C.F.R. § 392.9(a)(1).  Defendants claim that Defendant Distribution is entitled to summary judgment because it was Plaintiff's duty – *not* Defendant Distribution's duty – to secure and stabilize the cargo he was carrying in his trailer.  Both parties point to 49 C.F.R. § 392.9(b), which provides the following:

> (b) Drivers of trucks and truck tractors.  Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must –
>
> (1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;
>
> (2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle; and
>
> (3) Reexamine the commercial motor vehicle's cargo and its load securement devices during the course of transportation and make any necessary adjustment to the cargo or load securement devices, including adding more securement devices, to ensure that the cargo cannot shift on or within, or fall from, the commercial motor vehicle. . . .
>
> (4) The rules in this paragraph (b) do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its cargo or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.

49 C.F.R. § 392.9(b)(1)-(4).

Both parties also point to the Fourth Circuit's "*Savage* rule." In *United States v. Savage Truck Line, Inc.*, the Fourth Circuit pointed to the FMCSR and held the following:

> The primary duty as to the safe loading of property is . . . upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953), *cert. denied*, 347 U.S. 952 (1954).

"Although the *Savage* court's holding pertained to the issue of indemnity for damaged goods, several other circuits have since adopted or recognized the *Savage* Rule as setting forth the requisite duty of care in state common-law negligence cases." *Uzhca v. Wal-Mart Stores, Inc.*, No. 17-cv-3850 (NSR), 2020 U.S. Dist. LEXIS 167662, *25 (S.D.N.Y. Sept. 14, 2020) (citing, *e.g.*, *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 848-49 (8th Cir. 2010) (concluding, under Minnesota law, that the *Savage* Rule created a duty of care "to prevent latent loading defects"); *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 220-22 (3d Cir. 2010) (recognizing, under Pennsylvania law, that "a shipper may have liability when an accident results from movement of goods during transport if the shipper created a non-apparent condition that caused the load to shift")). Notably, "[n]either the Second Circuit nor the New York Court of Appeals have commented on whether the *Savage* Rule establishes a shipper's duty for negligence claims under New York law." *Id.* at *26. "However, at least one New York intermediate appellate court and one court in this district have recognized its applicability in the context of indemnity and comparative fault suits related to damage[d] goods." *Id.* (citing, *e.g.*, *Instrument Sys. Corp. v. Assoc. Rigging and Hauling Corp.*, 70 A.D.2d 529, 530-31, 416 N.Y.S.2d 5 (1st Dep't 1979) (concluding that a factual issue existed as to whether a shipper was negligent in loading and

whether any defect was latent); *Ebasco Servs., Inc.* [*v.*] *Pac. Intermountain Express Co.*, 398 F. Supp. 565, 567 (S.D.N.Y. 1975) (denying motion for summary judgment because an issue of fact existed as to whether a defect was latent or patent, where defendant sought indemnification for damage to property)). "Moreover, at least one court in this circuit has held that the *Savage* Rule establishes the requisite duty of care in negligence actions under New York law." *Id.* (citing *Zwolak v. Phoenix Steel Serv., Inc.*, No. 12-CV-00910F, 2015 U.S. Dist. LEXIS 139922, 2015 WL 5971128, at *7 (W.D.N.Y. Oct. 14, 2015) (recognizing that "under both New York law . . . and federal law, as stated in *Savage*, [a] carrier can be held liable for an obvious or apparent defect in loading" in a personal injury suit). *But see Yoos v. Better Life Tech., LLC*, No. 1:09-CV-0660 (LEK/DRH), 2012 U.S. Dist. LEXIS 7360, 2012 WL 177867, at *4 (N.D.N.Y. Jan. 23, 2012) (parenthetical omitted)).

In this District, the only court that has addressed the *Savage* rule in a case such as this found that "the rule . . . addresses the allocation of comparative liability following a finding of negligence, not the existence or scope of a defendant's preexisting duty." *Yoos v. Better Life Tech., LLC*, No. 1:09-CV-0660 (LEK/DRH), 2012 U.S. Dist. LEXIS 7360, *15 (N.D.N.Y. Jan. 23, 2012) (Kahn, J.) (citing, *cf. Ebasco Servs.*, 398 F. Supp. at 568; *Instrument Sys. Corp.*, 416 N.Y.S.2d at 6-7; *see also Spence*, 623 F.3d at 218-20; *Savage*, 209 F.2d at 445). "Moreover," the court stated, "the question of comparative liability is a factual matter to be resolved by the fact-finder, not a matter of law to be resolved on summary judgment." *Id.* at *15-*16 (citing *Ebasco Serv.*, 398 F. Supp. at 568; *Instrument Sys. Corp.*, 416 N.Y.S.2d at 7). Notwithstanding this conclusion, the court in *Yoos* found that, "[i]n loading its products onto the trailer, [the shipper] incurred a duty to do so with care and so as not to increase the risk of harm to others." *Id.* at *11 (citing *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275 (N.Y. 1922) ("[O]ne

who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.")) (other citations omitted).  The court ultimately found that there was a question of fact as to whether the shipper violated that duty of care because the shipper failed to use restraints or other securement devices when loading the trailer, and a reasonable jury could have found that the failure to use those devices constituted a latent or concealed defect.  *See id.* at \*16-\*18.

In this case, under the broad reasoning in *Yoos*, Defendant Distribution would have a duty of care to load the cargo in a secure manner.  More narrowly, under the *Savage* rule as adopted by other courts in this Circuit, Plaintiff would have been responsible for inspecting his cargo, but Defendant Distribution, as the loader, would have a duty to load the cargo in such a way that it did not have any latent or concealed defects.  The Court finds that, under either approach, Defendant Distribution had a duty of care to load the cargo in a manner that was free of latent or concealed defects in the cargo.  For the reasons discussed below, the Court finds that there is a question of fact as to whether Defendant Distribution breached this duty.

In his affidavit, Plaintiff explained that, upon arriving at Defendant Distribution's facility on May 14, 2018, he backed his truck up to the designated loading gate, and the loaders directed him to "go and wait in the cab of [his] truck" while they loaded it.  *See* Dkt. No. 78-3, Pl's Aff., at ¶¶ 11-14.  Plaintiff stated that he was told he was not allowed to observe the loaders loading the truck or to stand anywhere in the loading area or by the loading gate "[f]or safety reasons[.]"  *See id.* at ¶¶ 15-16.  Plaintiff attested that, after the workers finished loading the trailer, they did not call him out of the truck.  *See id.* at ¶ 22.  He allegedly only realized they had finished loading the trailer and that the doors were ready to be closed when he "felt the truck and trailer stop moving."  *See id.*

Plaintiff remarked that, when he went to the rear of the trailer to close the trailer doors, he "could not see inside the trailer past the first set of pallets that were nearest to the doors." *See id.* at ¶ 23. Plaintiff attested that all he could see were the "the last two pallets that were loaded onto the trailer, shrink-wrapped and stacked floor to ceiling, side by side at the end of the trailer, close together." *See id.* According to Plaintiff, "[t]here were no straps, and no room left to place straps or load locks because of the way it was tightly loaded by [Defendant] Distribution's loaders." *See id.* Plaintiff stated "definitively that there were no air bags or other dunnage placed on [his] truck by [Defendant] Distribution loaders to stabilize and secure the load during transport." *See id.* at ¶ 24. Plaintiff further alleged that Defendant Distribution's loaders did not place any other means of load restraint on his truck, "and the way they loaded the pallets onto [his] truck made it impossible for [him] to add any other load locks, bars or straps." *See id.*

Plaintiff explained that, as he opened the rear trailer door at the delivery destination in Washington, the pallet of boxes adjacent to the door he was opening fell partially out of the rear of the trailer, struck his body, pushed him to the ground, and fell on and severely injured his leg. *See id.* at ¶¶ 25-26. Plaintiff attested that, immediately after pulling himself free from under the boxes, he took a photograph of the rear of the trailer with the boxes halfway out, which he took immediately after the boxes fell on him but before anyone else touched the pallets, the boxes, or the trailer. *See id.* at ¶¶ 27-29. Plaintiff then stated that he watched as the trailer was partially unloaded, took some pictures of the partially emptied trailer, and verified that no air bags or other "dunnage" had been placed between the last two pallets or anywhere on his trailer. *See id.* at ¶ 30. Plaintiff submitted those photographs that he took to support his claim. *See* Dkt. Nos. 78-7, 78-8, 78-9.

John Mulligan, the Vice President of Operations for Defendant Distribution, attested that the loading diagram for Plaintiff's trailer showed placement of 30 pallets by commodity description and number in a "zig zag" line, so that the merchandise designated for delivery at the second stop would be loaded first at the nose of the trailer. *See* Dkt. No. 74-17 at ¶ 12. Mr. Mulligan also stated that, pursuant to the loading diagram, there would have been two air bags placed in the load – "one where the zig zag line was in the middle of the trailer and one between the last two pallets at the end of the trailer as indicated in the loading diagram." *Id.* Based on this declaration, Defendants argue that "there *was* an airbag placed . . . between the last two pallets on the end of the truck." *See* Dkt. No. 74-22 at 18. With respect to Plaintiff's photographs that do not show air bags, Defendants assert that "the lack of visibility of an airbag in the photo of the fallen cargo does not mean it was not there and it had obviously been removed by the time cargo has been taken out of the truck in the other photos[.]" *See id.*

Mr. Mulligan further disputed Plaintiff's account that he was "ordered" to stay in his truck while Defendant Distribution's employees loaded his trailer. *See* Dkt. No. 74-17 at ¶ 18. According to Mr. Mulligan, Defendant Distribution "generally advised drivers to stay off the loading docks during the loading process . . . But drivers could request to observe loading from safe areas near the access doors." *See id.* Even if Plaintiff had been "ordered" to stay in his truck during the loading process, Mr. Mulligan stated that Plaintiff was "free to come inside to inspect his truck after it was fully loaded." *See id.* at ¶ 19. Mr. Mulligan explained that, if Plaintiff had any concerns about the way the truck was loaded or the appearance of the load after it was on the trailer, he could have rejected the load altogether or asked that it be reloaded. *See id.* at ¶ 20.

Based on this disputed evidence, the Court finds that there is a clear question of fact regarding whether the loaders used air bags when they loaded the cargo into the trailer. The Court further finds that there is a question of fact as to whether Plaintiff was able to watch the loading process or whether he was "ordered" to sit in the cab of his truck. These questions are material as to whether Defendant Distribution breached its duty because, if, as Plaintiff attested, he could not see past the two pallets nearest the door when he looked in the back of the trailer at Defendant Distribution's facility once the cargo was loaded, then that would impact his ability to inspect the load for defects. As discussed above, the FMSCA's regulations require truck drivers to inspect their cargo in the manner set forth in 49 C.F.R. 392.9(b)(1)-(3) *unless* the trailer "has been loaded in a manner that makes inspects of its cargo impracticable." *See* 49 C.F.R. 392.9(b)(4). A factfinder could reasonably conclude that Plaintiff's inability to see past the last two pallets could have made the load "impracticable" to inspect. Additionally, a factfinder could reasonably conclude that the lack of air bags, "dunnage," or other securement devices could have been a latent or concealed defect if Plaintiff could not watch the loading process and could not see them when he looked in the back of the trailer because he could only see the last two pallets nearest the door. Because a factfinder will need to answer these questions of fact, the Court denies Defendant Distribution's motion for summary judgment.

**D. Whether the Court should preclude Defendants' expert's testimony**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *See* Fed. R. Evid. 702. "Under Rule 702, an expert with 'specialized knowledge [that] will help the trier of fact' may testify so long as that testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and methods' that the witness has 'reliably

applied . . . to the facts of the case.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting Fed. R. Evid. 702). "'Expert testimony should be excluded where it is "speculative or conjectural," but arguments that the expert's assumptions "are unfounded go to the weight, not the admissibility, of expert testimony."'" *Car Freshner Corp. v. Am. Covers, LLC*, No. 5:17-CV-171 (TJM/ATB), 2021 U.S. Dist. LEXIS 187895, *24-*25 (N.D.N.Y. Sept. 30, 2021) (McAvoy, S.J.) (quoting *Robinson v. Suffolk County Police Dep't*, 544 Fed. Appx. 29, 32 (2d Cir. 2013) [(summary order)] (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))). "In determining whether expert testimony will assist the trier of fact, a court must be careful to remember that such testimony may not either '"usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it[.]"'" *Id.* at *25 (quoting *Nimely*, 414 F.3d at 397 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Plaintiff has cross-moved pursuant to Rule 702 to preclude admission of testimony, a declaration, and a narrative report from Defendants' expert, Richard W. Carr, C.D.S. *See* Dkt. No. 78-10 at 25-34. Plaintiff does not dispute Dr. Carr's qualifications as a trucking and transportation expert, nor does he challenge the scientific methodology that Dr. Carr uses when coming to his opinions. *See generally id.* Instead, Plaintiff argues that Dr. Carr relies on facts that are in dispute in coming to his opinions, looks at those facts in the light most favorable to Defendants while ignoring Plaintiff's interpretation of them, and ultimately comes to legal conclusions of which he is not entitled to opine as an expert. *See id.*

In the section of Dr. Carr's report in which he provides his opinion, he states that Defendants "Irving and Distribution were not negligent. These entities did not do or fail to do anything that caused or contributed to the accident involving [Plaintiff]." *See* Dkt. No. 74-15 at

14. Dr. Carr then explains that the cargo loaded onto the tractor trailer were palletized and shrink wrapped within shipper and motor carrier norms. *See id.* Dr. Carr opined that Defendant Distribution loaded Plaintiff's trailer within industry standards and did so in a secure manner. *See id.* Dr. Carr also found that Defendant Distribution loaded Plaintiff's tractor trailer properly and in compliance with all state and federal laws. *See id.* at 15.

In addition to these conclusions, Dr. Carr remarked that Plaintiff "had the opportunity to inspect the load after it was loaded and to request adjustments," that Plaintiff "could have requested [Defendant Distribution] to re-work the cargo load," could have placed load securement devices on the trailer himself to stabilize the load if he saw a need to do so, and any "failure to adhere to OSHA rules, standards, regulations and other applicable Federal[,] State[,] and local laws, rules, ordinances, regulations, and standards if in fact they occurred would have been by the failure of [Plaintiff] to adhere to such." *See id.* at 14-15. Furthermore, Dr. Carr asserted that Defendant Distribution "placed two airbags in [Plaintiff's] trailer while loading it" to reduce and limit cargo movement. *See id.* at 14. He also concluded that Plaintiff was "solely and individually responsible for the operation of said tractor trailer and in full and total possession and control of the cargo," and "[i]t should have been common knowledge and expected by [Plaintiff] that his cargo could have and would have shifted while traveling 2,900+ miles across country." *See id.* at 16.

Although Dr. Carr's report indisputably contains legal conclusions that are inappropriate from an expert, he also makes proper conclusions about the packaging and loading of the cargo, and whether, as described, such cargo would have been secure for the trip from New York to Washington. To come to these conclusions, however, Dr. Carr relies on facts the Court has determined are in dispute. These facts include whether Plaintiff was able to fully inspect the

cargo after it was loaded, if Defendant Distribution used air bags or other securement devices, and if there was a latent deficiency in the way the cargo was loaded. Since Plaintiff has submitted a declaration and report from his own expert, Dr. Singh, regarding these issues, and the Court finds that there are multiple questions of fact that the factfinder must determine, the Court denies Plaintiff's motion to preclude Dr. Carr from testifying and to strike his expert report and declaration. Ultimately, the factfinders will have to weigh the credibility of both the lay and expert witnesses and come to their own conclusions as to whether Defendant Distribution acted negligently.

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 74, is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** to the extent that the Court **DISMISSES** all claims against Defendant Irving Consumer Products, Inc.; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** with respect to Plaintiff's cause of action for negligence against Defendant Distribution Unlimited, Inc.; and the Court further

**ORDERS** that Plaintiff's cross-motion to strike Defendants' expert's testimony, declaration, and report, is **DENIED in its entirety**; and the Court further

**ORDERS** that the trial of this action shall commence at **10:00 a.m.** on August 14, 2023, in Albany, New York. The Court will issue a separate Final Pretrial Scheduling Order, setting forth the deadlines for filing pretrial submissions, including motions *in limine*, at a later date.

**IT IS SO ORDERED.**

Dated: March 27, 2023
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge